MURRAY MATHEWS

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed April 24, 1903.*

1. LABOR—*right of persons to contract to and for labor.* An employer whose workmen are on a strike has a right to contract with others to fill the places of those who are out, and any workman seeking employment may contract to work in the place of the strikers.

2. SAME—*the right to labor and employ labor is a constitutional right.* Denial of the right of a workman or employer to contract with each other with reference to labor is a violation of the provisions of the State and Federal constitutions, which guarantee all persons equal protection of the laws, and which prohibit the depriving of a person of life, liberty or property without due process of law.

3. CONSTITUTIONAL LAW—*Free Employment Agency act is unconstitutional.* Section 8 of the Free Employment Agency act of 1899, (Laws of 1899, p. 268,) which prohibits superintendents of agencies from furnishing workmen or lists of workmen to employers whose men are on a strike or locked out, is in aid of strikes, regardless of their justice, is repugnant to the constitution, and, being inseparable from the other provisions, the whole act is void.

4. SAME—*legislature has no power to deny employer of striking workmen the benefits of employment agency.* The legislature has no power to deny to an employer whose men are out upon a strike or are locked out, the right to obtain workmen from free employment agencies and at the same time grant such right to other employers not similarly situated.

5. SAME—*section 10 of Free Employment Agency act is void.* Section 10 of the Free Employment Agency act of 1899, providing that no person shall maintain a private employment agency for hire or where a fee is charged without first obtaining a license, is unconstitutional, when considered in connection with the remainder of the act. (*Price* v. *People,* 193 Ill. 114, overruled.)

6. SAME—*section 2 of Free Employment Agency act is unconstitutional.* Section 2 of the Free Employment Agency act of 1899, which fixes salaries of officers and provides the mode of their payment, is in violation of section 16 of article 4 of the constitution, providing that bills making appropriations for such salaries shall contain no provision on any other subject.

CARTER and BOGGS, JJ., dissenting.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. E. F. DUNNE, Judge, presiding.

This is an indictment against the plaintiff in error for operating a private employment agency for hire in the city of Chicago without first having procured a license from the Secretary of State, and without having given a bond in the penal sum of $1000.00, conditioned for the faithful performance of the duties of a private employment agent, as required by section 10 of an act of the General Assembly, entitled "An act to create free employment offices in cities of certain designated populations, and to provide for the maintenance, management and control of the same, and to prevent private imitations of the name of the same, and regulating private employment agencies," approved April 11, 1899, and in force July 1, 1899. A plea of not guilty was entered by the court for plaintiff in error, defendant below; a jury was waived, and the cause was submitted to the court for trial without a jury. It is not denied that the proof, adduced by the People, was sufficient to sustain the allegations of the indictment. At the close of the evidence, plaintiff in error submitted to the court written propositions of law to the effect that the indictment does not charge any offense known to the laws of Illinois, or of the United States of America; that said act is void as a whole, because it is in contravention of the constitutions of Illinois, and of the United States; and, further, that certain specified sections of the act are void, as being in contravention of the State and Federal constitutions, to-wit, sections 2, 8 and 10. The court marked as "held" the proposition, stating that the indictment did not charge any offense known to the laws of the United States, but marked all the other propositions "refused." The court thereupon found plaintiff in error guilty and fined him $50.00 and costs. The present writ of error is sued out for the purpose of reviewing the judgment thus rendered, which was entered by the criminal court of Cook county.

The act of April 11, 1899, entitled as above set forth, is as follows, to-wit:

"Sec. 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly:* That free employment offices are hereby created as follows: One in each city of not less than fifty thousand population, and three in each city containing a population of one million or over, for the purpose of receiving applications of persons seeking employment, and applications of persons seeking to employ labor. Such offices shall be designated and known as Illinois Free Employment Offices.

"Sec. 2. Within sixty days after this act shall have been in force, the State Board of Commissioners of Labor shall recommend, and the Governor, with the advice and consent of the Senate, shall appoint a superintendent and assistant superintendent and a clerk for each of the offices created by section 1 of this act and who shall devote their entire time to the duties of their respective offices. The assistant superintendent or the clerk shall in each case be a woman. The tenure of such appointment shall be two years, unless sooner removed for cause. The salary of each such superintendent shall be $1200.00 per annum, the salary of such assistant superintendent shall be $900.00 per annum. The salary of such clerks shall be $800.00 per annum, which sums, together with proper amounts for defraying the necessary costs of equipping and maintaining the respective offices, shall be paid out of any funds in the State treasury not otherwise appropriated.

"Sec. 3. The superintendent of each such free employment office shall, within sixty days after appointment, open an office in such locality as shall have been agreed upon between such superintendent and the secretary of the Bureau of Labor Statistics as being most appropriate for the purpose intended; such office to be provided with a sufficient number of rooms or apartments to enable him to provide, and he shall so provide, a separate room or apartment for the use of women registering for situations

or help.   Upon the outside of each such office, in position and manner to secure the fullest public attention, shall be placed a sign which shall read in the English language, Illinois Free Employment Office, and the same shall appear either upon the outside windows or upon signs in such other languages as the location of each such office shall render advisable.   The superintendent of each such free employment office shall receive and record in books kept for that purpose names of all persons applying for employment or help, designating opposite the name and address of each applicant the character of employment or help desired.   Separate registers for applicants for employment shall be kept, showing the age, sex, nativity, trade or occupation of each applicant, the cause and duration of (non) employment, whether married or single, the number of dependent children, together with such other facts as may be required by the Bureau of Labor Statistics to be used by said bureau: *Provided,* that no such special registers shall be open to public inspection at any time, and that such statistical and sociological data as the bureau of labor may require shall be held in confidence by said bureau, and so published as not to reveal the identity of any one:   *And provided, further,* that any applicant who shall decline to furnish answers to the questions contained in special registers shall not thereby forfeit any rights to any employment the office might secure.

"Sec. 4.   Each such superintendent shall report on Thursday of each week to the State Bureau of Labor Statistics the number of applications for positions and for help received during the preceding week, also those unfilled applications remaining on the books at the beginning of the week.   Such lists shall not contain the names or addresses of any applicants, but shall show the number of situations desired and the number of persons wanted at each specified trade or occupation.   It shall also show the number and character of the positions se-

cured during the preceding week. Upon receipt of these lists, and not later than Saturday of each week, the secretary of the Bureau of Labor Statistics shall cause to be printed a sheet showing separately and in combination the lists received from all such free employment offices; and he shall cause a sufficient number of such sheets to be printed to enable him to mail, and he shall so mail, on Saturday of each week, two of said sheets to each superintendent of a free employment office, one to be filed by said superintendent, and one to be conspicuously posted in each such office. A copy of such sheet shall also be mailed on each Saturday by the secretary of the State Bureau of Labor Statistics to each State inspector of factories and each State inspector of mines. And it is hereby made the duty of said factory inspectors and coal mine inspectors to do all they reasonably can to assist in securing situations for such applicants for work, and describe the character of work and cause of the scarcity of workmen, and to secure for the free employment offices the co-operation of the employers of labor in factories and mines. It shall be the duty of such factory inspectors and coal mine inspectors to immediately notify the superintendent of free employment offices of any and all vacancies or opportunities for employment that shall come to their notice.

"Sec. 5. It shall be the duty of each such superintendent of a free employment office to immediately put himself in communication with the principal manufacturers, merchants and other employers of labor, and to use all diligence in securing the co-operation of the said employers of labor, with the purposes and objects of said employment offices. To this end it shall be competent for such superintendents to advertise in the columns of daily newspapers for such situations as he has applicants to fill, and he may advertise in a general way for the co-operation of large contractors and employers in such trade journals or special publications as reach such

employers, whether such trade or special journals are published within the State of Illinois or not: *Provided,* that not more than $400.00, or as much thereof as shall be necessary, shall be expended by the superintendent of any one such office for advertising any one year.

"Sec. 6. It shall be the duty of each such superintendent to make report to the State Bureau of Labor Statistics annually, not later than December first of each year, concerning the work of his office for the year ending October first of same year, together with a statement of the expenses of the same, including the charges of an interpreter when necessary, and such report shall be published by the said Bureau of Labor Statistics annually with its coal report. Each such superintendent shall also perform such other duties in the collection of statistics of labor, as the secretary of the Bureau of Labor Statistics may require.

"Sec. 7. No fee or compensation shall be charged or received, directly or indirectly, from persons applying for employment or help through said free employment offices; and any superintendent, assistant superintendent or clerk, who shall accept, directly or indirectly, any fee or compensation from any applicant, or from his or her representative, shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not less than $25.00 nor more than $50.00 and imprisoned in the county jail not more than thirty days.

"Sec. 8. In no case shall the superintendent of any free employment office created by this act, furnish or cause to be furnished, workmen or other employes to any applicant for help whose employes are at that time on strike, or locked out; nor shall any list of names and addresses of applicants for employment be shown to any employer whose employes are on strike or locked out; nor shall such list be exposed where it can be copied or used by an employer whose employes are on strike or locked out.

"Sec. 9. The term 'applicant for employment' as used in this act shall be construed to mean any person seeking work of any lawful character, and 'applicant for help' shall mean any person or persons seeking help in any legitimate enterprise; and nothing in this act shall be construed to limit the meaning of the term 'work' to manual occupation, but it shall include professional service, and any and all other legitimate services.

"Sec. 10. No person, firm or corporations in the cities designated in section 1 of this act shall open, operate or maintain a private employment agency for hire, or where a fee is charged to either applicants for employment or for help, without first having obtained a license from the Secretary of State, which license shall be $200.00 per annum, and who shall be required to give a bond to the People of the State of Illinois, in the penal sum of $1000.00 for the faithful performance of the duties of private employment agent; and no such private agent shall print, publish, or paint on any sign, window, or newspaper publication, a name similar to that of the Illinois free employment offices. And any person, firm or corporation violating the provisions of this act, or any part thereof, shall be deemed guilty of a misdemeanor and upon conviction shall be fined not less than $50.00 nor more than $100.00.

"Sec. 11. Whenever, in the opinion of the Board of Commissioners of Labor, the superintendent of any free employment office is not duly diligent or energetic in the performance of his duties, they may summon such superintendent to appear before them and show cause why he should not be recommended to the Governor for removal, and unless such cause is clearly shown the said board may so recommend. In the consideration of such case an unexplained low percentage of positions secured to applicants for situations and help registered, lack of intelligent interest and application to the work, or a general inaptitude or inefficiency, shall be considered by said

board a sufficient ground upon which to recommend a removal. And if, in the opinion of the Governor, such lack of efficiency cannot be remedied by reproval and discipline, he shall remove as recommended by said board: *Provided,* that the Governor may at any time remove any superintendent, assistant superintendent or clerk for cause.

"Sec. 12. All such printing, blanks, blank books, stationery and postage as may be necessary for the proper conduct of the business of the offices herein created shall be furnished by the Secretary of State upon requisition for the same made by the secretary of the Bureau of Labor Statistics."

ROBERT N. HOLT, and H. T. WILCOXON, for plaintiff in error.

H. J. HAMLIN, Attorney General, CHARLES S. DENEEN, State's Attorney, and FRANK W. BLAIR, for the People.

Mr. CHIEF JUSTICE MAGRUDER delivered the opinion of the court:

The question involved in this case, arising out of the refusal of the trial court to hold certain propositions of law submitted by the plaintiff in error, is the constitutionality of the "act to create free employment offices in cities of certain designated populations," etc., as set forth in the statement preceding this opinion.

Section 8 of the act in question contains the following extraordinary provision: "In no case shall the superintendent of any free employment office, created by this act, furnish or cause to be furnished, workmen or other employes to any applicant for help, whose employes are at that time on strike, or locked out; nor shall any list of names and addresses of applicants for employment be shown to any employer, whose employes are on strike or locked out; nor shall such list be exposed, where it can be copied or used by an employer, whose employes are on strike or locked out." The act purports upon its face

to be a means of assisting persons, seeking employment, to obtain the same, and also of assisting employers, who need labor or help, to obtain the same. And yet section 8 declares that any employer, whose employes are on a strike, or have been locked out, shall not, when applying for help, be furnished any workmen or other employes. And not only so, but such employers, whose workmen may be on a strike or locked out, shall not be allowed to see any list of names or addresses of applicants for employment. And not only so, but no such list of applicants for employment shall be placed where it can be copied or used by an employer, whose employes are on a strike, or locked out. Clearly, the exception, contained in section 8, makes the act void as a whole, because that section enters into and pervades the whole act, and cannot be separated from it without defeating the intention of the legislature in passing the act.

An examination of the different provisions of the act shows that it professes to be for the benefit of employers, as well as of employes. Section 1 provides that free employment offices are thereby created, one in each city of not less than fifty thousand population, and three in each city containing a population of one million or over, "for the purpose of receiving applications of persons seeking employment, and applications of persons seeking to employ labor." If one of the purposes of creating free employment offices is to receive applications of persons seeking to employ labor, what justice can there be in refusing to entertain the applications for labor of employers, whose employes may be on a strike, or may be locked out, irrespective of the question whether or not there is any good reason or justifiable cause for the existence of such strike or lock-out? By the broad terms of section 8, the employer therein mentioned is deprived of the right to have any workmen furnished to him, or to have any list of applicants for employment shown to him, or to have any such list exposed where he can pos-

sibly make use of it, even though his employes. may have gone out upon a strike for no good cause whatever. A lock-out has been defined to be the closing of a factory or workshop by an employer, usually in order to bring the workmen to satisfactory terms by a suspension of wages. Even though an employer may have had just cause and good reason for closing his factory or workshop, yet, even in such case, he is subjected to the deprivation enforced by section 8.

In section 3 of the act, "the superintendent of each such free employment office shall receive and record in books kept for that purpose names of all persons applying for employment or help, designating opposite the name and address of each applicant the character of employment or help desired." The superintendent here referred to is to be appointed by the Governor, not of his own motion, or in pursuance of his own selection, but upon the recommendation of the State Board of Commissioners of Labor, which consists of five members, three of them "manual laborers," and the remaining members "manufacturers or employers of labor in some productive industry." (2 Starr & Curt. Ann. Stat.—2d ed.—p. 1807). The superintendent is not only required to receive and record the names of applicants seeking employment, but also of applicants seeking help, or seeking to employ labor. By the terms of section 4 the superintendent is required to report to the State Bureau of Labor Statistics "the number of applications for positions and for help received." Here, again, the applications of employers for help are treated as being entitled to as much consideration as the applications of employes for positions or places of employment. The lists, referred to in section 4, are required to show "the number of situations desired, and the number of persons wanted at each specified trade or occupation." Full information is thus obtained, and required to be obtained, by these superintendents, of the persons wanting workmen, as well as

of the persons wanting employment. Presumably, the needs of the employers in this regard cannot be known to the superintendent without the action of the employers themselves in giving information of their needs. By section 4, also, factory inspectors and coal mine inspectors are required to do all they reasonably can to assist in securing situations for applicants for work, and it is also made their duty to describe the character of work "and cause of the scarcity of workmen, and to secure for the free employment offices the co-operation of the employers of labor in factories and mines." It is also made the duty of such factory inspectors and coal mine inspectors by section 4 "to immediately notify the superintendent of free employment offices of any and all vacancies or opportunities for employment that shall come to their notice." It thus appears that the co-operation of the employers of labor in factories and mines is to be sought. Inspectors of factories and mines are required to state the "cause of the scarcity of workmen," and to give notice "of any and all vacancies or opportunities for employment that shall come to their notice." If the scarcity of workmen shall be caused by strikes or lockouts, or if vacancies exist in factories or coal mines by reason of strikes and lock-outs, the inspectors are required to give information in regard to the same to these superintendents. Although the free employment offices and their superintendents are located only in cities containing not less than fifty thousand population and in those containing a population of one million or over, yet the inspectors are required to report to them as to the condition of labor in factories and mines anywhere and everywhere in the State.

By section 5 the superintendent is required "to immediately put himself in communication with the principal manufacturers, merchants and other employers of labor, and to use all diligence in securing the co-operation of the said employers of labor, with the purposes and ob-

jects of said employment offices." Manufacturers and merchants and other employers of labor are thus to be communicated with, and all diligence is to be used to secure their co-operation in carrying out the purposes and objects of these free employment agencies, and yet such employers are to be deprived of all the benefit to be derived therefrom, if those employed by them happen to be on a strike or to be locked out, whether with or without justifiable cause. By the terms of section 9, "applicant for employment" means "any person seeking work of any lawful character;" and "applicant for help" means "any person or persons seeking help in any legitimate enterprise."

Thus, all the way through the act, the employer, seeking men to work for him, and the employe, seeking work to do, are placed upon the same footing, and are equally entitled to the benefits of the act in question. Employers, however, are arbitrarily divided into two classes, one class where a strike or lock-out may exist, and another class where no strike or lock-out exists. There is no rational basis in law or justice for this distinction, where the language is so broad as to include, as well those who have caused the strike or lock-out for good reasons, as those who have caused such strike or lock-out without any good reason. The prohibition, contained in section 8, not only affects the class of employers there named, but it also affects the persons seeking employment, with whom such employers might otherwise come in contact. That is to say, not only the employers, whose men are on a strike or are locked out, are affected by the prohibition, but laborers or employes, who might desire to fill the places of the employes who are on a strike or are locked out, are also affected by it. The applicants for employment are deprived of the privilege of working for the class of employers named in section 8. That section, therefore, strikes at the interests of applicants for work and of employers seeking work or labor.

An employer, whose workmen have left him and gone upon a strike, particularly when they have done so without any justifiable cause, is entitled to contract with other laborers or workmen to fill the places of those who have left him.   Any workman seeking work has a right to make a contract with such an employer to work for him in the place of any one of the men, who have left him to go out upon a strike.   Therefore, the prohibition, contained in section 8, strikes at the right of contract, both on the part of the laborer and of the employer.   It is now well settled that the privilege of contracting is both a liberty, and a property right.   Liberty includes the right to make and enforce contracts, because the right to make and enforce contracts is included in the right to acquire property.   Labor is property.   To deprive the laborer and the employer of this right to contract with one another is to violate section 2 of article 2 of the constitution of Illinois, which provides that "no person shall be deprived of life, liberty or property without due process of law."   It is equally a violation of the fifth and fourteenth amendments of the constitution of the United States, which provide that no person shall be deprived of life, liberty or property without due process of law, and that no State shall deprive any person of life, liberty or property without due process of law, "nor deny to any person within its jurisdiction the equal protection of the laws."   (*Ritchie* v. *People*, 155 Ill. 98; *Adams* v. *Brenan*, 177 id. 194; *Gillespie* v. *People*, 188 id. 176; *Fiske* v. *People*, id. 206).   The provision, embodied in section 8, "is a discrimination between different classes of citizens founded on no justifiable ground, and an attempt to exercise legislative power in behalf of certain classes and against other classes, whether laborers seeking work or employers. It falls under the condemnation of the constitution."

Section 8 draws an unwarrantable distinction between workmen, who apply for situations to employers where there is no strike or lock-out, and workmen who

do not so apply, and it also draws an unwarrantable distinction between employers who may have the misfortune to be the victims of a strike or lock-out, and employers who do not have such misfortune. That is to say, section 8 does not relate to persons and things as a class, or to all employers, but only to those, who have not been the victims of strikes or lock-outs. "Where a statute does this, where it does not relate to persons or things as a class, but to particular persons or things of a class, it is a special as distinguished from a general law." (*Gillespie* v. *People, supra*). Judge Cooley, in his work on Constitutional Limitations (6th ed. pp. 481, 483,) says: "A statute would not be constitutional * * * which should select particular individuals from a class or locality, and subject them to peculiar rules, or impose upon them special obligations or burdens from which others in the same locality or class are exempt. * * * Every one has a right to demand that he be governed by general rules, and a special statute which, without his consent, singles his case out as one to be regulated by a different law from that which is applied in all similar cases, would not be legitimate legislation, but would be such an arbitrary mandate as is not within the province of free governments." (*Gillespie* v. *People, supra*). The conclusion is inevitable that this section 8 is a provision "in aid of strikes and strikers, whether right or wrong, and regardless of the justice or the propriety of the strike or lock-out."

By the terms of this law, the statute creates free employment agencies, and provides for the payment of those who operate them, out of the money of the people of the State; and yet it singles out a particular class of citizens, and, without cause, deprives them of the benefits of the provisions of the act, while it grants such benefits to another class of persons, who have no greater right to the same than the persons subjected to the deprivation.

The fourteenth amendment to the constitution of the United States provides, that "no State shall make or

enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." In interpreting this provision of the Federal constitution, the Federal and State courts hold an act, like the one here under consideration, which is unduly discriminating and partial in its character, to be unconstitutional. In other words, legislation of this kind is condemned by the courts. The legislature has no power to deny to the employer, whose men are out upon a strike or are locked out, the right to obtain workmen from these free employment agencies, and at the same time to grant such right to other employers not similarly situated. (*Millett* v. *People*, 117 Ill. 294; *Ritchie* v. *People, supra; Ruhstrat* v. *People*, 185 Ill. 133).

We are unable to see why the doctrine, recently announced by the Supreme Court of the United States in the case of *Connolly* v. *Union Sewer Pipe Co.* 184 U. S. 541, is not precisely applicable to the facts in the case at bar. In the latter case, the Supreme Court of the United States declared what is known as the Anti-trust act of 1893 of the State of Illinois to be unconstitutional and void, as being in conflict with the provisions of the fourteenth amendment above quoted, upon the ground that it improperly discriminated in favor of agricultural products or live stock in the hands of the producer or raiser. (*People ex rel.* v. *Butler Street Foundry Co.* 201 Ill. 236). The Illinois act of 1893 provided substantially that where two or more persons, firms, corporations or associations of persons, combined their capital, skill or acts in respect of their property, merchandise or commodities held for sale or exchange, they should be subjected to a certain penalty as being guilty of forming a trust, but the ninth section of the act contained this exception, to-wit: "The provisions of this act shall not apply to agricultural pro-

ducts or live stock while in the hands of the producer or raiser." In *Connolly* v. *Union Sewer Pipe Co. supra,* the Supreme Court of the United States said: "We have seen that under that statute all except producers of agricultural commodities and raisers of live stock, who combine their capital, skill, or acts for any of the purposes named in the act, may be punished as criminals, while agriculturalists and live stock raisers, in respect of their products of live stock in hand, are exempted from the operation of the statute, and may combine and do that which, if done by others, would be a crime against the State. The statute so provides, notwithstanding persons engaged in trade or in the sale of merchandise and commodities, within the limits of a State, and agriculturalists and raisers of live stock, are all in the same general class, that is, they are all alike engaged in domestic trade, which is, of right open to all, subject to such regulations, applicable alike to all in like conditions, as the State may legally prescribe." It was held in that case, that such discrimination against those, engaged in business other than the sale of agricultural products and live stock in the hands of producers, was forbidden by the clause of the fourteenth amendment, which declares that no State "shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." It was also there held that the fourteenth amendment, in making the declaration above quoted, "intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; that they should have like access to the courts of the country for the protection of their persons and property, the prevention

and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition," etc.  These principles are precisely applicable to the present case, where a greater burden is imposed by section 8 upon employers who are subjected to strikes and lock-outs, than upon other employers in the same calling and condition, who are not subjected to such strikes and lock-outs, irrespective of the justice or propriety of the strike or lock-out.

It is claimed, however, by the Attorney General, that section 8 can be eliminated from the Employment act without invalidating the rest of the act.  Undoubtedly, "if different sections of a statute are independent of each other, that which is unconstitutional may be disregarded, and valid sections may stand and be enforced.  But if an obnoxious section is of such import that the other sections without it would cause results not contemplated or desired by the legislature, then the entire statute must be held inoperative."  (*Connolly* v. *Union Sewer Pipe Co. supra*).  In the *Connolly case* it was held by the Supreme Court of the United States, that the exception, contained in section 9 of the Illinois act of 1893, made the whole act invalid.  Upon this subject the Supreme Court of the United States there say: "The first section of the act here in question embraces by its terms all persons, firms, corporations, or associations of persons who combine their capital, skill or acts for any of the purposes specified, while the ninth section declares that the statute shall not apply to agriculturalists or live stock dealers in respect of their products or stock in hand. If the latter section be eliminated as unconstitutional, then the act, if it stands, will apply to agriculturalists and live stock dealers. Those classes would in that way be reached and fined, when, evidently, the legislature

intended that they should not be regarded as offending against the law, even if they did combine their capital, skill, or acts in respect of their products or stock in hand. Looking, then, at all the sections together, we must hold that the legislature would not have entered upon or continued the policy indicated by the statute, unless agriculturalists and live stock dealers were excluded from its operation, and thereby protected from prosecution. The result is, that the statute must be regarded as an entirety, and in that view it must be adjudged to be unconstitutional, as denying the equal protection of the laws to those within its jurisdiction, who are not embraced by the ninth section."

In the case at bar, if section 8 be eliminated from the Employment act, the other sections without it would cause results not contemplated or desired by the legislature. This is so, because, without the obnoxious clause or section, all employers, including those whose workmen are out upon a strike or are locked out, as well as all others, would be entitled to the benefits of the act. But clearly it was the intention of the legislature, by inserting section 8 in the act, to deprive the class of employers therein named of the benefits of the act. Consequently, the elimination of that section would not be in accordance with the manifest intention of the legislature. An elimination of section 8 would make the act apply to all classes of employers, and thereby cause a result evidently not contemplated or desired by the legislature. If all the sections of the act be construed together, it is evident that the legislature would not have created the free employment agencies in question, unless the class of employers, mentioned in section 8, were excluded from the operation of the act. It follows that the Employment act of April 11, 1899, must be regarded as unconstitutional as an entirety.

Section 10 of the act, under which the present prosecution was instituted, depends upon all the other provi-

sions of the act, and is so connected with them that it cannot stand by itself. Section 1 of the act provides for the creation of free employment agencies, and section 7 of the act provides that no fee or compensation shall be charged or received directly or indirectly from persons applying for employment or help from the free employment offices. Section 10, following immediately upon the provisions in reference to free employment agencies where no fee is charged, provides that no person, etc., shall maintain a private employment agency for hire, or where a fee is charged, without first having obtained a license, etc., which license is fixed at the sum of $200.00 per annum. Whatever else may have been the purpose of section 10, whether designed for revenue or for regulation, or as an exercise of the police power, or otherwise, its evident design was to discourage the existence of private employment agencies by compelling them to pay a heavy license fee, and to throw business into the hands of free employment agencies where no fee is charged. The purpose also of section 10 was to prevent imitation of the name of the free employment agencies in the mode therein indicated. It follows that the whole act, including section 10, relates to but one subject, the creation and operation of free employment agencies; and when the act is declared unconstitutional so far as the free employment agencies are concerned, section 10 falls with the balance of the act, because it is merely a part of the scheme to promote the business of the free employment agencies and secure their successful operation. Section 10 provides that any person, etc., violating the provisions of the act, or any part thereof, shall be deemed guilty of a misdemeanor. Therefore, any superintendent, who furnishes or causes to be furnished workmen or other employes to any applicant for help whose employes are at that time on strike or locked out, or shall show to any such employer any list of names and addresses of applicants for employment, or expose the same where

it can be copied or used by such employer, would be deemed guilty of a misdemeanor and subject to the punishment prescribed by section 10. Section 10 is directed mainly against the imitation by private employment agencies of the name of the Illinois free employment offices, and, of course, if the part of the act in reference to such free employment offices is void for the reasons already stated, then the necessity for section 10 no longer exists. There can be no doubt that section 10 "would never have been enacted as a law without the remainder of the act. * * * The legislature would not provide against imitation of something having no existence, and would provide for the free agencies before providing that they should not be imitated."

In the case of *Price* v. *People,* 193 Ill. 114, the validity of section 10 only of the Free Employment Agency act was passed upon. Although the errors assigned in that case were broad enough to have raised the question of the validity of the entire act, yet the only question, presented by counsel in their arguments in that case, was the validity of section 10. It was there held that section 10, requiring persons operating private employment agencies for hire in certain cities to pay a license fee of $200.00 per annum, and give a bond for $1000.00, was not unconstitutional, upon the grounds that conducting a private employment agency for hire is an occupation, for which the legislature may require a license fee, in order to promote the public welfare, and that, in the exercise of its police power, the legislature may provide that an occupation, which is a proper subject of such power, shall not be followed, except under a license issued by public authority upon the payment of a license fee, and the execution of a bond in accordance with the purposes of the act. But section 10, as there passed upon, was considered as standing by itself, and without reference to its connection with the balance of the act. No decision was there made as to the validity of the act as an

entirety.  Upon further reflection we are satisfied that, while the views there expressed may be correct as applicable to a section like section 10 standing by itself, yet when applied to section 10 as a part of the whole act, they ought not to be adhered to.  The case of *Price* v. *People, supra,* was decided in October, 1901, and the rehearing therein applied for was denied in December, 1901. Since that time, to-wit, in March, 1902, the Supreme Court of the United States has announced its decision in *Connolly* v. *Union Sewer Pipe Co. supra,* and the latter case holds that legislation, containing such an exception as section 8 of the act of April 11, 1899, is in contravention of the fourteenth amendment of the constitution of the United States.  As the Supreme Court of the United States is paramount authority upon all questions relating to the interpretation of the constitution of the United States, we feel it to be our duty to follow the holding of that court to the effect that such legislation, as is here under consideration, is a violation of the fourteenth amendment.  (*Mapes* v. *Scott,* 94 Ill. 379).  Therefore, the case of *Price* v. *People, supra,* is overruled.

Counsel for the plaintiff in error are correct in the contention, that section 2 of the act of April 11, 1899, is violative of the constitution of Illinois.  Section 2 of the act, after fixing the amount of salaries to be paid the superintendent, assistant superintendent and clerks, provides as follows: "which sums, together with proper amounts for defraying the necessary costs of equipping and maintaining the respective offices, shall be paid out of any funds in the State treasury not otherwise appropriated."  This provision is in conflict with section 16 of article 4 of the constitution of this State, which provides as follows: "The General Assembly shall make no appropriation of money out of the treasury in any private law.  Bills making appropriations for the pay of members and officers of the General Assembly, and for the salaries of the officers of the government, shall contain

no provision on any other subject." (1 Starr & Cur. Ann. Stat.—2d ed.—p. 131). The superintendents, assistant superintendents and clerks, mentioned in the act, are officers of the government within the meaning of section 16, as construed in the case of *Ritchie* v. *People,* 155 Ill. 98, and, therefore, their salaries must be provided for by separate act or bill. Section 16 of article 4 makes such appropriations an independent subject of legislation, and consequently section 2 is void. If the act were otherwise constitutional, section 2, being distinct and separable from the balance of the act, would not affect the same, and could be eliminated so as to allow the remainder of the act to stand. But in view of the considerations already presented, the whole of the act, including section 2, must fall.

Accordingly, the judgment of the criminal court of Cook county is reversed.        *Judgment reversed.*

CARTER and BOGGS, JJ., do not concur in the conclusion reached by the majority of the court.