Gorman, J.
The above two causes are identically the same except the names of the persons on whose behalf the writs of habeas corpus are sued out, and the numbers of the cases. They will therefore be considered and determined as one case, as the same facts and principles of law are common to both.
On the 15th day of December, 1911, each of the petitioners above named, Saul Berger and William Skahn, were arrested upon warrants issued by James S. Myers, a justice of the peace of Cincinnati township, based upon affidavits charging each of them with a violation of Section 12943 of the General Code of Ohio, in that on or about December 2d, 1911, William Skahn did unlawfully discharge and coerce one Wilfred Garand, who was then and there an employe of the MacDonald & Kiley Com *402 pany, an Ohio corporation, from the employment of the said the MacDonald & Kiley Company, knowing that the said G-arand was then and there a member of and in connection with the United Shoe Workers of America, Local 26, Cincinnati, Ohio, a labor organization, and that on or about December 2d, 1911, Saul Berger did unlawfully discharge and coerce Edward Schroeder, an employe of the Roth Shoe Manufacturing Company from the employment of said company, knowing that the said Schroeder was then and there a member of and in connection with the United Shoe Workers of America, a lawful labor organization. Each of the petitioners were apprehended under and by virtue of said warrants on the 15th day of December, 1911, by Philip Tiernan, a constable of this township, and immediately each of said petitioners sued out a writ of hateas corpus under the above entitled causes and numbers, alleging in each of their said petitions that each one is illegally restrained and deprived of his liberty without any legal authority, by Philip Tiernan, constable of Cincinnati township, Hamilton county, Ohio; and praying that upon a hearing thereof, each may be discharged from 'such illegal restraint. The writ was made returnable forthwith.
The constable, Philip Tiernan, answered the petition justifying his arrest and detention of the petitioners under and by virtue of the warrants aforesaid, and attached to his answer and made part thereof the affidavit and warrant in each case; and he prays that the writs issued be dismissed and that the petitioners be returned to his custody and charge.
To the answer in each case the petitioner has demurred on the grounds that the facts therein set forth are not sufficient in law, and for the further reason that the warrants as set forth in said answers are unlawful and in contravention of the Fifth Amendment to the Constitution of the United States; of the Fourteenth Amendment to the Constitution of the United States; of Section 1, Article I of the Constitution of the state of Ohio; and- of Section 26, Article II of the Constitution of the state of Ohio; and that said warrants are based upon complaints under a statute in contravention of the provisions aforesaid and are void.
*403 The ease was fully and ably argued by counsel for the petitioners and for the answering officer, and briefs were submitted on December 23, 1911.
The sole question raised by the demurrer is whether or not Section 12943, General Code (89 Ohio Laws, p. 269, Section 1), is a valid law, or unconstitutional and in contravention of any provision of the Constitution of the United States or of the Ohio Constitution.
Section 12943, General Code of Ohio, under which the warrants were issued in this case, and the validity of which is questioned by the petitioners, was passed by the Legislature in 1892, and reads as follows:
“Whoever, being a member of a firm, or agent, officer or employe of a company, corporation or person, prevents employes from forming, joining or belonging to a lawful labor organization, or coerces or attempts' to coerce employes, by discharging or threatening to discharge them from their employ, or the employ of a firm, company or corporation, because of their connection with such labor organization, shall be fined not more than one hundred dollars or imprisoned not more than six months or both."
For the purpose of these habeas corpus cases, the demurrers admit that the petitioners have violated the provisions of this law; but they seek to avoid the penalty involved in its violation by pleading the invalidity and nullity of the law. In other words, the petitioners claim that the Legislature of Ohio had no power or authority to enact this law, because it, the Legislature, is prohibited by the Constitution of the United States and the Constitution of Ohio from making, passing or enacting laws of the kind and character of Section 12943, General Code. The specific provisions of these constitutions, or parts thereof,, which it is claimed are contravened and violated by this enactment are the following:
The Fifth Amendment of the Constitution of the United States which reads in part as follows:
“No person * * * shall be deprived of life, liberty, or property without due process of law.”
*404 The Fourteenth Amendment of the Constitution of the United 'States which reads in part as follows:
“* * * Nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."
Article I, Section 1, of the Constitution of Ohio reads as follows:
“All men-are by nature, free and independent, and have certain. inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and seeking and obtaining happiness and safety."
Article II, Section 26 of the Ohio Constitution reads in part as follows:
“All laws, of a general nature, shall have a uniform operation throughout the state.” * * *
It is not believed that the law. can be claimed. to be invalid unless it does contravene one or more of these provisions of these constitutions.-
Under our form of government we have as the fundamental law of the nation, a Constitution of the United States, the underlying law adopted by the people of this union, and wherein and whereby the people have defined and limited the powers of their own government, and the branches thereof— the legislative, executive and judicial. Certain things are therein prohibited to be done either, by Congress or by any state of the union; and the purpose of these inhibitions is said to be to protect and secure the natural and inalienable rights of the weaker, or minorities, from the aggressions or oppressions of the strong, or the majorities; to prevent a tyrranical majority from overriding the minority and depriving this minority of its natural rights. Were it not for the desire of the people to protect the weak minority from the tendency of majorities to impose the rule of their will upon the minority regardless of the justness or equity of the rule, and the further desire of all the people to limit the powers of their officials and public servants, there would be no necessity or occasion for written constitutions. All the *405 states of this Union have constitutions in the main similar to the Federal Constitution, adopted by the people of the several states, and for the same reasons that prompted all the people of the United States to adopt a Constitution. Among the provisions of the federal Constitution and the Ohio Constitution are those above cited which are drawn in question in this case.
Now, the power to determine whether or not any specific provision of the federal or state Constitution has been violated or contravened by any of the departments of government — the legislative, the executive or the judicial — must and should be lodged somewhere; otherwise, there could be no security to the people of their rights under their fundamental law. Majorities electing legislatures could secure the passage of laws so obnoxious to all sense of justice and so violative of all natural rights as to render the government odious in the eyes of all fair minded persons.- Executive officers might arbitrarily exceed all the powers granted to them by the Constitution, and impose their autocratic will, under the guise of law enforcement, upon a helpless people. Judges, in the exercise of -their functions, might exceed their powers and jurisdictions as defined by the Constitutions, were their decisions not subject to review and the powers and jurisdiction which they may exercise, subject to be questioned by other judges and other courts. So it is that the acts and proceedings of all three branches of our government should be and are subject to inquiry as to the right to exercise the powers, functions and prerogatives which from time to time they do exercise. It has been thought wise and proper to lodge in our courts the power and authority of determining in any given case whether or not there hás been a usurpation of power by any branch of the government, and especially whether or not the legislative branch thereof has exceeded its authority under the Constitution in the enactment of any law. As to the wisdom of this grant of power to the courts we are not now to discuss or consider. If this power is to be exercised by any tribunal — and it would seem that it should be — there is probably no better lodgment place for the exercise thereof than in our courts. The judges are supposed to be, and generally are, learned in the law; and by education and *406 training, study and experience are undoubtedly better qualified to pass judgment upon the validity of a law, of the Legislature, an act of an executive officer, or a judicial decision, than any other class or group of men. However this may be, this power is lodged with the courts and it becomes their duty to exercise it, whenever called upon in a proper case and in the proper manner, and to render a fair and impartial decision under their oaths of office and to the best of their abilities.
The 'question, therefore, presented in this case — and the sole question as has been heretofore said — is whether or not this act of the Ohio Legislature, passed in 1892, contravenes any of the provisions of the federal or state constitutions; and that question is submitted to this court in this case for determination.
It seems to be well settled that the question can be raised in a habeas corpus proceeding as well as on error to a criminal prosecution. See, Ex parte Edward Kline, 6 C. C., 215; Ex parte Siebold, 100 U. S., 176.
The validity or constitutionality of this enactment has never been passed upon by the Supreme Court of this state, or by any circuit court, but there are two decisions of the courts of common pleas of this state directly in point; one by Judge John R. Sayler, formerly a judge of this court, and one by Judge Pugsley of the Lucas County Common Pleas, each of whom reached diametrically opposite conclusions as to the constitutionality of the section.
In the case of Davis v. State, 30 Bulltein, 342, Judge Sayler held the law constitutional after an able presentation of the law by such distinguished counsel as Judge Hiram D. Peck on behalf of the validity of the law, and Senator Joseph B. Foraker against the proposition. The case was taken on error to the circuit court of this county, but when called for argument, Davis who was cóntending for the validity of the law, failed to appear and the proceeding was dismissed in that court for want of prosecution.
In the case of State v. Bateman, 7 Nisi Prius, 487, decided after Judge Sayler’s decision was rendered, Judge Pugsley, sitting on the Lucas county common pleas bench, held the law to be unconstitutional.
*407 Both of these judges were of high standing with the bench and bar of this state, and their decisions are carefully considered and numerous authorities cited to support their respective conclusions.
Outside of this state laws similar to or almost identical with our Section 12943, General Code, have been construed by several courts in the following cases:
In Coffeyville Co. v. Perry, 69 Kan., 297, a statute almost word for word like ours was under consideration by the Supreme Court of Kansas,' and it was there held that the law did not fall under the police power because it did not affect the public welfare, health, safety or morals of the community; and that inasmuch as the law interfered with the right to terminate a contract, it was in contravention of that provision of the federal Constitution, which guarantees to every citizen the protection of life, liberty and property, and therefore null and void.
In People v. Marcus, 185 N. Y., 257, a law similar to the statute under consideration, was held unconstitutional because in contravention of those organic provisions of. the federal and state constitutions which guarantee that no person shall be deprived of life, liberty or property without due process of law, and that the law unduly restricted the right of contract of the persons at whom the law was aimed. Judge Bartlett, however, in this ease, dissented from the finding of the majority of the court and held the law to be a valid exercise of the police power on the part of the Legislature.
In the case of State v. Julow, 129 Mo., 163, the Supreme Court of Missouri held a similar law unconstitutional because it was in contravention of the constitutional guarantee that no person shall be deprived of life, liberty, or property without due process of law; and that the enactment of the statute was not a valid exercise of the police power.
To the-same effect are the cases of Gillespie v. State, 188 Ill., 176; State v. Kuertzberg, 114 Wis., 530; Matthews v. People, 202 Ill., 389.
A similar law passed by Congress was up for construction in the Circuit and Supreme Courts of the United States in the case of Adair v. the United States, 152 Fed. Rep., 737, same case 208 *408 U. S., 161. The ease arose on the arrest of one Adair, an agent of a railroad company in eastern Kentucky, charged with the violation of Section 10 of the act of Congress passed June 1, 1898, making it a criminal offense punishable by fine for any employing common carrier doing an interstate business and subject to the provisions of the act, or any officer or agent thereof to threaten any employe with loss of employment or unjustly discriminate against any employe because of his membership in a labor organization. A demurrer was filed to an indictment against Adair as an agent of the railroad company, charging him with having violated this law by discharging an employe named Coppage because of his membership in a labor organization. Judge Cochran, in a very exhaustive and able decision reported in 152 Federal Reporter, held the section of the law and the entire act to be constitutional. On appeal by Adair to the Supreme Court, reported in 208 U. S., 161, that tribunal reversed Judge Cochran by a divided court of six to two, Justice Moody not sitting. The opinion of the majority was announced by Justice Harlan, in the course of which among other things, he said:
“The first inquiry is whether the part of the tenth section of the act of 1898 upon which the first count of the indictment was based is repugnant to the Fifth Amendment of the Constitution (of the United States) declaring that no person shall be deprived of liberty or property without due process of law. In our opinion, that section, in the particular mentioned, is an invasion of the personal liberty as well as the right of property guaranteed by that amendment. Such liberty and right embraces the right to make contracts for the purchase of the labor of others, and equally the right to make contracts for the sale of one’s own labor; such right, however, being, subject to the fundamental condition that no contract, whatever its subject-matter, can be sustained, which the law upon reasonable grounds forbids as inconsistent with public interests or hurtful to the public order, or detrimental to the common good. ’ ’
And further along the court says:
“Mr. Cooley in his treatise on Torts, page 278, well says:
“It is a part of every man’s civil rights that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason or is the result of whim, *409 caprice, prejudice or malice. With his reasons neither the public nor third persons have any legal concern. It is also his right to have business relations with any one with whom he can make contracts, and if he is wrongfully deprived of this right by others he is'“ entitled to redress.”
Anri further along Justice Harlan uses this language:
‘ ‘ The right of a person to sell his labor upon such terms as he deems proper, is, in its essence, the same as the right of the purchaser of labor to prescribe the conditions upon which he will accept such labor from the person offering to sell it. So the right of the employe to quit the service of the employer for whatever reason is the same as the right of the employer for whatever reason,, to dispense with the services of such employe. It was the legal right of the defendant, Adair, however unwise such course might have been, to discharge Coppage because of his being a member of a labor organization, as it was the legal right of Coppage, if he saw fit to do so, however unwise such course on his part might have been, to quit the service in which he was engaged because the defendant employed some persons who were not members of a labor organization. In all such particulars the employer and the employe has equality of right, and any legislation that disturbs that equality is an arbitrary interference with the liberty of contract, which no government can legally justify in a free land.”
Justice McKenna in his dissenting opinion, after discussing the question of whether or not Congress might pass the law under consideration in the exercise of its power to regulate interstate commerce, says as to the validity of Section 10 of the act involved, among other things on page 185 of this report:
“We are told that labor associations are to be commended. May not Congress then recognize their existence; yes, and recognize their power as conditions to be counted with in framing legislation 1 Of what use would it be to attempt to bring bodies of men to agreement and’ compromise, if you put out of view the influences which move them or the fellowship which binds them— maybe controls and impels them — whether rightfully or wrongfully to make the cause of one the cause of all ? ”
In the opinion of Justice McKenna, the law under consideration including section ten of the act which prohibited the employer from coercing the-employe by threatening to discharge *410 him, or by discharging him because of his connection with a lawful labor union, was a valid law and contravened no provision of the federal Constitution. Justice Holmes also in a strong dissenting opinion concurred with Justice McKenna as to the constitutionality of the law. In the course of his opinion, he says:
. “The section (Section 10) is, in substance, a very limited interference, with freedom to contract; no more. It does not require the carriers to employ any one. It does not forbid them to refuse to employ any one, for any reason they deem good, even where the notion of a choice of persons is a fiction and wholesale employment is necessary upon general principles that it might be proper to control. The section simply prohibits the more powerful party to exact certain undertakings, or to threaten dismissal or unjustly discriminate on certain grounds against those already employed. I hardly can suppose that the grounds on which a contract may lawfully be made to end are less open to regulation than other terms. So, I turn to the general question whether the employment can be regulated at all. I confess that I think that the right to make contracts at will that has been derived from the word liberty in the amendments has been stretched to the extreme by the decisions; but' they agree that sometimes the right may be restrained. Where there is, or generally is believed to be, an important ground of public policy for restraint, the Constitution does not forbid it, whether this court agrees or disagrees with the policy pursued. It can not be doubted that' to prevent strikes, and, so far as possible, to foster its scheme of arbitration, might be deemed by Congress an important point of policy, and I think it impossible to say that Congress might not reasonably think that the provision in question would help a good deal to carry its policy along. But suppose the only effect really were to tend to bring about a complete unionizing of such railroad laborers as Congress can deal with; I think that object alone would justify the act. I quite agree that the question what and how much good labor unions do, is one on which intelligent people may differ. I think that laboring men sometimes attribute to them advantages, as many attribute to combinations of capital disadvantages, that really are due to economic conditions of a far wider and deeper kind — but I could not pronounce it unwarranted if Congress should decide that to foster a strong union was for the best interest, not only of the men, but of the railroads and the country at large.”
In short, Justice Holmes appears to hold that the legislative body of Congress was not exceeding its authority in passing this *411 law, upon the theory that it might conduce to the general welfare.
Now, there can be no doubt that, to the extent that this Ohio statute undertakes to prescribe the lengths that the employer may go. in dictating to his employe the terms and conditions upon which he may remain in his employ, it is a limited interference with the freedom to contract.
It seems to be conceded by all courts that have passed upon legislation of the character of Section 12943, General Code, that if there exists power and authority to enact it, under the federal and state constitutions, in view of their provisions looking to the guaranteeing of the natural rights of the citizens, it must be under the police power of the state. No court has ever yet specifically defined this power, or fixed the limits beyond which the state may go in its exercise. Justice Iiarlan in the Adair case, 208 U. S., at page 173, in speaking of this power, says:
"There are, however, certain powers existing in the sovereignty of each state in the Union, somewhat vaguely termed police powers, the exact description and limitation of which have not been attempted by the courts. Those powers, broadly stated, and without at present any attempt at a more specific limitation, relate to the safety, health, morals' and general welfare of the public. Both property and liberty are held on such reasonable conditions as may be imposed by the governing power of the state in the exercise of those powers, and with such conditions the Fourteenth Amendment was not designed to interfere.”
It therefore becomes a question in each ease where the natural liberty of the citizen, guaranteed by the Constitution, is limited or interfered with, whether or not the public safety, health, morals or general welfare are advanced or promoted by the legislation affecting the liberty of the citizen. If I am to decide this ease on precedent alone, then by the overwhelming weight of authority I must decide the law unconstitutional, notwithstanding the decision of Judge Sayler in the case above cited and the decision of Judge Cochran in the Adair case, and the able dissenting opinions herein referred to. In the absence of any authoritative decision of our Supreme Court or circuit court, I am at liberty to follow the decision of Judge Pugsley or Judge Sayler, or I may disregard either or both, perhaps, and decide the case on *412 reason and principle. . There is more reason for following a decision of a former judge of this court than for following one of another common pleas judge of this state outside of this county. Laws similar' to our Section 12943, General Code, have been enacted in New York, New Jersey, Pennsylvania, Indiana, Illinois, Missouri, Wisconsin, Minnesota, Colorado and California, and perhaps in other states. When directly brought in question these laws have been held unconstitutional in Illinois, Kansas, Missouri and Wisconsin. If they have been passed upon by any of the courts .of the other states, except the two common pleas decisions in Ohio heretofore cited, I have been unable to find the decisions.
Now, generally speaking, the grounds of these decisions are that the law violates one or more of the federal or state constitutions by interfering with the liberty of contract, or are special legislation not having a uniform operation; that they have the effect of punishing the employer for discharging his employes, when he has a- natural inherent right to hire or discharge whoni he pleases, without being obliged to give any reason for his conduct, or for mere caprice, whim or malice if he pleases, and regardless of the injury which may be inflicted on the employe by reason of his discharge, provided he is employed at the will of the employer.
But the question also arises in this case, as it may have arisen in other similar cases, may not and does not this law respect and recognize this right of the employer — which it must be conceded he has — and nevertheless protect the employe’s right to belong to his association or union free from interference, coercion, or intimidation by his employer ?
The employe’s property is labor. This is what he has to sell, and he should be allowed as great freedom as possible for the purpose of selling it for the highest price he can legally obtain therefor, either singly -or in combination with his fellow laborers. It is almost impossible in this age of modern complicated machinery and combination of capital, for a laborer to secure, by Tri-maAlf, fair terms from the employer; hence the necessity for labor unions to enable the workingmen to combine and deal with their employers jointly as one man, thereby securing better terms *413 and prices for their labor. While it may be the motto of the large employer of labor to “divide and conquer” it is also the battle cry of the laborer to “unite or be conquered.” Labor unions are recognized in all states and by the federal government as lawful organizations, to promote and advance the material, intellectual and moral welfare of their members. Now, although these unions have a strong influence upon the relation of employe and employer, they are not in reality a part of it. If these unions are recognized by the law as lawful agencies for the promotion of the well-being of the laborers, may not the state protect them against attempts to disrupt them and break them up by the' use of force, violence, coercion, intimidation, threats and methods and means not recognized as legal ? Can it be doubted that the state has the right to protect the property and liberties of the employer .against coercion, threats and violence from the employes? A threat of a discharge of an employe may or may not be justifiable, depending upon the motive, intent or purpose with which it is made. No one has a legal right to coerce or -intimidate another into doing or not doing against his will, a legal or an illegal act. If the threat to discharge an employe is made, not for the purpose of subserving the employer’s interests or business, but for the sole purpose of coercing the employe into doing something not connected with the employer’s business, but entirely aside from it, it can not be claimed, I think, to stand on the same basis as the discharge or threat in furtherance of the employer’s business. In the one case it is intimidation; in the other it is not.
In Freund on Police Powers, Section 326, it is said:
“While the employer can not be forbidden to protect himself against hostile unions, an attempt on his part to coerce the laborer to keep away or withdraw from ‘any union,’ if understood as meaning any union whatsoever, may be treated as exceeding the measure of legitimate self defense. Gross forms of intimidation may, of course, be absolutely forbidden.”
We have many examples of the exercise of the powers of the state through legislation to protect and secure to the citizens their rights from coercion, intimidation and wrongful interference. We have on the Ohio statutes, laws prohibiting employers *414 from coercing their employes into buying goods from themselves or others, Section 12944; prohibiting an employer from threatening an employe with discharge for not signing a local option petition, Section 12948; prohibiting an employer from threatening to discharge an employe because he fails or refuses to labor on election day between the hours of 5:30 a. m. and 9 a. m., Sections 12949-12951; prohibiting life insurance companies from discriminating against colored persons, Sections 12954-12955; prohibiting inns, hotels, restaurants, etc., from discriminating against colored persons.
There are laws which limit our freedom of action, right to contract, our mode of living, our freedom of speech, and we can scarcely be 'said to have one single natural right that is not hampered; limited or curtailed by the state. We are required to support our parents if they be indigent. Trains carrying passengers must carry a crew of not less than five persons. Safety couplers and brakes must be attached to locomotives and cars. No man is allowed to work alone in a coal mine. Tenement buildings must be constructed according to certain plans and designs and be equipped with fire escapes. Partition fences can not be of hedges or barbed wire. Our food must all be up to' the standard. There are a thousand and one ways in which the citizen is required to conform his conduct or so use his property, rights, and liberty as not to interfere with or injuriously affect the property, liberty, rights and freedom of his fellow citizen. Under our form of government there is no such thing as absolute rights. Our rights are all qualified and limited; and we must more and more, as the problems of life become more complicated and the struggle for existence becomes sharper, submit to a further curtailment of our natural rights in order to promote the general welfare and advance the common weal.
Now, it appears to -me that the construction placed upon this Section 12943 by Judge Sayler is just as reasonable as the construction of Judge Pugsley and the other courts who decided as he did. I think this statute can be so interpreted as to hold it constitutional and still not unreasonably infringe upon the employer’s rights to protect and defend himself and his interests. It leaves him the full right to select his own employes >and apply *415 any test he may desire when he employs them; it leaves him free to discharge them with or without a reason, for a mere whim or caprice; but it prevents him from using his superior strength of position to attack and suppress the legal, rights of his employes, which the law recognizes as essential to their welfare and the health, existence and happiness of the laborers and their families. It is in the interest of the peace, health, happiness, comfort and morals of the workingmen and their families that the bread winner be constantly employed at the highest wages that he can command for his labor, and to that end the states of this Union and the federal government have recognized and do now recognize the legality and importance of laboring men maintaining efficient.unions through which, in the warfare or struggle with capital, the laborers may act in unison as one man for their mutual benefit and welfare.
Now may not the state enact a law to protect this association against improper and illegal attacks that may be made upon it ? If the employer were to place a pistol at the heads of his employes and threaten them if they refused to withdraw from their union, would any one say that this act was not a coercion on the part of the employer? When a workingman is absolutely dependent upon his labor and his job for his living and his family’s living, can any one doubt that a threat to discharge him if he does not withdraw from his union is a coercion? Theoretically, it may be said that the employer may discharge him without a reason or for a reason which he may keep to himself, and the consequences to him are the same. But this law, as I interpret it, is to protect the union, a lawful organization, and a threat or coercion against a member of the union to compel him to withdraw therefrom may be made unlawful, just as threats, intimidations and coercions against church members to do them harm if they do not withdraw from their church may be made a misdemeanor or a crime. It is contrary to public policy to permit any one to be forced, coerced, or intimidated by another to do or not to do a thing. As Judge Sayler has put it in the Davis case above cited:
"I think the Legislature has the power to enact that the coercion of one person by another may be an offense.”
*416 And again, in speaking of the effect of this law upon the employer, he says:
“I do not think this takes away from the employer the right to discharge him for any reason, but he shall not'attempt to coerce him to quit the labor organization.”
It seems to me that the Legislature has here undertaken to make an offense of that which would not be an offense, except for the motive or intent with which the act is done. There are many eases in which a person may be liable for doing an otherwise lawful and proper thing, if it is done with an evil intent, or a malicious motive. A person takes my horse from my stable and rides away on him. Now the character of this act in law depends upon the motive or intention of that person at the time he took the horse. If I had before that time given him permission to take the'horse, he has committed no wrong. If I had not given him permission, but he had had the horse before that time to do an errand and he took him on this day for the same purpose but without my consent, he would be liable to me civilly for the use of the horse and any injury done to him. If, however, he took him without my knowledge or consent, but with the intention to take and keep the horse as his own, he would be liable for the theft of the horse and guilty of a crime.
, If the employer discharges the laborer or threatens to discharge him from his employ, not for the purpose of benefitting him or his business, but with the sole intent or motive of coercing or intimidating the employe into withdrawing from his labor organization, is he not acting from bad and malicious'motives with a wicked intent to injure the labor organization by breaking it up or attempting to break it up? Under this statute, as I read it, the employer may be chargeable with an offense although he does not actually discharge the employe. The threat tb discharge him because of his connection with the labor organization is the coercion defined by the statute, and whether the employe withdraws from the.labor organization, or whether the employer discharges him in fact, the offense has been committed. It seems to me that Judge Pugsley has missed the point to this statute when he says that:
*417 “To constitute the offense a discharge or threat to discharge for the reason stated must be shown.”
And this he says the employer may do.
The following eases hold that an act lawful in itself may be unlawful if done maliciously or in an unlawful manner. Keeble v. Heckeringill, reported in a note to Carrington v. Taylor, 11 East, 573, where the defendant was held liable for damages in tort, for firing off his gun in the air — a perfectly lawful act — with malicious intent to scare away wild fowl from the plaintiff’s decoy. The same principle was adopted in Carrington v. Taylor, supra. In Bowen v. Mall, 6 Q. B. D., 333, the same principle was recognized and adopted. See, also, Lumley v. Lye, 2 Ellis & Bl., 216; Mogul Steamship Co. v. McGregor, G. & Co., 21 Q. B. D., 544; People v. North River Sugar Refining Co., 7 N. Y. Sup., 406; Walker v. Cronin, 107 Mass., 555; Moore & Co. v. Bricklayers Union, 33 Bull., 48.
A very interesting and exhaustive article in point by Professor Jeremiah Smith, with numerous citations, will be found in 20th Harvard Law Review, pp. 251 to 279 inclusive, under the title of "Crucial Issues in Labor Litigation." In this article he says on page 273:
“It will be said that a man has the absolute right to threaten to do that which he has a right to do. Granted that what you may absolutely do yoii may absolutely threaten to do (give unqualified notice of your intention to do). But it does not follow that you may conditionally threaten to do it."
In this connection, it will be interesting and profitable to read the following cases on this point, as to how far one may be legally liable for maliciously doing an act which he has the absolute right to do. Allen v. Flood et al (1898), A. C., 1; Knowlton v. Berry, 188 Mass., 353; Quinn v. Leathern (1901), Law Rep. Appeal Cases, 495.
The rule laid down in these cases does not apply to acts which a man does on his own land, as for instance, erecting a spite fence. See Letts v. Kessler, 54 O. S., 73; Barclay v. Abraham, 121 Ia., 619.
It has been held in several cases that the members of a trade union have no right to strike for the purpose of coercing the em *418 ployer to do a thing against his will, although the right to strike for their own benefit and to advance their own interests has been generally held to be legal. See following: Folsom v. Lewis, 208 Mass., 336; Schlang v. Ladies Waist Makers Union, 67 Miscel. (N. Y.), 221; Kemp v. Division No. 241 Amalgamated Assn. of St. & Elec. Ry. Employes, 153 Ill. App., 344; Irving v. Joint Dist. Council U. B. of C., 180 Fed. Rep., 896; O'Brien v. People, 216 Ill., 354.
It would seem to be as fair to hold the employer to the same rule .as the employe is held in the above eases. And if this act, although ordinarily an absolute right, be done from motives of unmixed malice, as the term is employed, gives rise to an action for damages as for a tort, why may not the Legislature under the police power make the act also a misdemeanor or a crime in furtherance of the public good and general welfare.
This limitation upon the right to contract has recently become a living question by reason of the laws passed in several of the states, including Ohio, limiting the hours of labor of women and children, and in certain industries. A law to that effect has been upheld in Oregon, and has been also upheld in Ohio by the circuit court of Cleveland, and the case is now pending in the Supreme Court. The grounds upon which the state undertakes to limit the hours of labor in these cases is in the interest of sound morals, good health for our women and the general welfare of our citizens. See, Bolton v. State, 11 C.C.(N.S.), 472.
Upon full consideration of the law, its purposes and the good that may be accomplished by it, without apparently doing harm or injustice to the employer, I am of the opinion that this legislation is a valid exercise of the police power by the Legislature.
«.If it were a doubtful question, and at best it appears to be so, it would be my duty to sustain the law as a constitutional enactment. Unless the law is clearly, palpably in conflict with the Constitution so that there is no doubt or hesitancy in the mind of the court, it should not be declared unconstitutional. If there be any doubt as to its validity, that doubt must be resolved in favor of its constitutionality. State, ex rel, v. Covington, 29 O. S., 103-118; Marmet v. State, 45 O. S., 63-64.
*419 The judgment of the court is that the petitioners, Saul Ber^ ger and William Skahn be remanded and delivered over to' the officer, Constable Tiernan, to be dealt with according to law.