## IDA M. MOYERS *et al.* v. CITY OF MEMPHIS.[*]

### (*Jackson.*   April Term, 1916.)

1. **ATTORNEY AND CLIENT. United States. Powers of congress.**
Congress has the power to determine the conditions upon which the government will consent to be sued, or upon which it will grant pensions or other bounties, or prescribe conditions upon which attorneys will be allowed to represent claimants or litigants before any of the courts of the government, within certain reasonable limitations, if done by general laws applicable to all alike, and in advance of the services rendered in such courts. (*Post, pp.* 289, 290.)

Acts cited and construed: Acts 1887, ch. 359; Acts 1861, ch. 45; Acts 1891, ch. 496.

Cases cited and approved: Printing & N. Registering Co. v. Sampson, L. R., 19 Eq., 465; McGowan v. Parish, 237 U. S., 285; Wylie v. Coxe (1853), 15 How., 415; Wright v. Tebbitts, 91 U. S., 252; Stanton v. Embry, 93 U. S., 548; Taylor v. Bemiss, 110 U. S., 42; Ball v. Halsell, 161 U. S., 72; Mayton v. Raymond, 4 Am. L. Times (N. S.), 21; McPherson v. Cox, 6 Otto (96 U. S.), 404; Nutt v. Knut, 200 U. S., 12; Moyers v. Fahey, 43 Wash. L. Rep., 691; Frisbie v. U. S., 157 U. S., 160; Fitzgerald v. Grand Trunk Railroad, 63 Vt., 169; Parker v. Davis, 79 U. S., 457; L. & N. R. R. Co. v. Mottley, 219 U. S., 467; Wailes v. Smith, 157 U. S., 271; Ralston v. Dunaway, 184 S. W., 425.

Cases cited and distinguished: Lochner v. New York, 198 U. S., 45; Allgeyer v. Louisana, 165 U. S., 589; Williams v. Fears, 179 U. S., 270; Addyston Pipe & Steel Co. v. U. S., 175 U. S., 211; Railroad v. Voigt, 176 U. S., 498; Ball v. Halsell, 161 U. S., 72; McMicken v. Perin, 18 How., 507; In re Paschal, 10 Wall., 483; Stanton v. Embry, 93 U. S., 548; Matthews v. People, 202 Ill., 389.

[*]On the question of validity of statutory provision for attorney's fees see note in 17 L. R. A. (N. S.), 910.

As to right of attorney who takes case on contingent fee or for certain percentage to implied or equitable lien on fund recovered, see note in 27 L. R. A. (N. S.), 634.

2. **CONSTITUTIONAL LAW.** Liberty of contract. Regulation. Powers of congress.

Congress has the power to regulate and restrain the conduct and contracts of all persons for the common good, the possession and enjoyment of liberty and property being subject to such reasonable conditions as may be essential to the safety, health, peace, good order, and morals of the community. (*Post, p.* 290.)

3. **CONSTITUTIONAL LAW.** Powers of congress. Liberty of contract.

The liberty of contract is one of the inalienable rights of a citizen, embracing as it does, the right to enter a lawful calling and to acquire and dispose of property, so that a general prohibition against entering into contracts with respect to property is unconstitutional and void. (*Post, pp.* 290, 291.)

4. **CONSTITUTIONAL LAW.** Due process of law. Construction.

The due process of law clauses of the federal Constitution, while designed to preserve life, liberty, and property inviolate against arbitrary power, were not intended to interfere with the police power of the different States. (*Post, pp.* 291, 292.)

5. **CONSTITUTIONAL LAW.** Liberty of contract. Regulation. Powers of congress.

Liberty of contract and right of property are not absolute and universal, in spite of the Fifth and Fourteenth Amendments to the United States Constitution, and it is within the power of the government to restrain some individuals from all contracts, as well as all individuals from some contracts. (*Post, pp.* 291, 292.)

6. **ATTORNEY AND CLIENT.** Compensation. Contingent fees. Legality.

A contract between an attorney and a city, by which the attorney is to receive fifty per cent. of the amount collected from the government on a claim arising out of the Civil War, is legal and valid, and not against public policy. (*Post, pp.* 292, 293.)

7. **ATTORNEY AND CLIENT.** Constitutional law. Powers of congress. Depriving of property.

Act Cong. March 4, 1915, chapter 140, section 4, 38 Stat. 996, prohibiting and amount in excess of twenty per cent of the

Moyers v. Memphis.

amount collected to be paid to the attorney collecting Civil War claims included under the bill, is unconstitutional and invalid, under Const. U. S. Amend. 5, as to attorneys who have performed their services and secured the allowance of claims prior to its enactment, since they have then a vested property right, which cannot be destroyed by arbitrary act of Congress. (*Post, pp.* 292, 293.)

Act cited and construed: Acts 1915, ch. 140.

8. **ATTORNEY AND CLIENT. Compensation. Contingent fees.**
While the courts do not always favor contingent fees, and look with some suspicion upon them, especially where the amount agreed to be paid represents fifty per cent. of the total claim, still the trend of judicial decision is in favor of upholding and enforcing such contracts, where no question of fraud, misrepresentation, or unfair dealing is raised. (*Post, p.* 293.)

9. **UNITED STATES. Claims against United States. "Gift." "Bounty."**
An amount appropriated under Act March 4, 1915, to repay the city of Memphis for the rental value of land taken for a navy yard during the Civil War is not a gift or bounty, but is in the nature of a debt supported by good and valuable consideration. (*Post, pp.* 293, 294.)

FROM SHELBY

Appeal from the Chancery Court of Shelby County. —I. H. Peres, Special Chancellor.

Neuhardt & Anderson and C. F. Consaul, for appellant.

C. M. Bryan, for appellees.

MR. W. H. SWIGGART, Special Judge, delivered the opinion of the Court.

This case was submitted to the chancery court of Shelby county on an agreed state of facts, under section 5206 of Shannon's Code, and without any formal pleadings. This section is as follows:

"The same parties who are entitled to enter into an agreement of submission to arbitration, may, in like manner, with or without action brought, agree upon a case containing the facts upon which the controversy depends, and submit the same to the circuit or chancery court of the county in which either of the parties resides, or in which a suit might have been brought to determine such controversy."

The necessary affidavit that the controversy was real, and the proceedings in good faith, and the bond required under the following sections of the Code were made, so that the chancery court had jurisdiction of the controversy.

The chancellor decided in favor of complainants, and the city of Memphis has appealed from the decree to this court.

The only issue involved is whether section 4 of the Act of Congress of March 4, 1915 (38 Stat. 962), is a valid and constitutional enactment. This act was passed by the Congress of the United States appropriating the money and authorizing the secretary of the treasury to pay the claimants, whose names are set out in the act, the several sums appropriated

therein; the claims provided for being divers and numerous "war claims," most of which had been adjudicated and allowed by the court of claims, at various times in the past. It is the statute which is often referred to as the "Omnibus Bill." Section 4 of this act is as follows:

"That no part of the amount of any item appropriated in this bill in excess of twenty per centum thereof shall be paid or delivered to or received by any agent or agents, attorney or attorneys, on account of services rendered, or advances made in connection with said claim.

"It shall be unlawful for any agent or agents, attorney or attorneys, to exact, collect, withhold or receive any sum which in the aggregate exceeds twenty per centum of the amount of any item appropriated in this bill on account of services rendered or advances made in connection with said claim, any contract to the contrary notwithstanding. Any person violating the provisions of this act shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum not exceeding $1,000."

By the signed agreement, upon which the case is submitted to the court, it appears that in December, 1876, the city of Memphis employed Gilbert Moyers, an attorney of Washington, D. C., to prosecute a certain claim against the United States for the occupation and use of certain real estate in Memphis, formerly known as part of the "Navy Yards," which property belonged to the city; that Gilbert Moyers,

after several years' delay, succeeded in having this claim submitted to the court of claims for its adjudication, and soon thereafter died. Complainants are practicing attorneys of the city of Washington, being the daughter and son-in-law of Gilbert Moyers, and also administrators of his estate. After the death of Gilbert Moyers the city of Memphis employed complainants to continue the prosecution of this claim as attorneys for the city, and agreed with them that they should have fifty per cent. of the amount collected on this claim as their compensation or fee. Complainants took proof in the case, prepared and filed briefs, and argued the case before the court of claims, and finally obtained an adjudication in favor of the city for the sum of $21,192.88, in the year 1905. This judgment was certified by the court of claims to the senate about December, 1905. No appropriation was made to pay this claim until the passage of the act of 1915, heretofore mentioned, when provision was made for its payment, along with many other claims of like character, by said act of Congress.

After this act was passed, and the money appropriated to pay the claim, in view of section 4 of the act quoted above, the complainants collected on their fee only twenty per cent. of the amount of the claim, and the city collected eighty per cent. thereof; that is, a treasury warrant was issued in favor of the city for $16,954.31, and another warrant was issued to complainants for $4,238.57, being twenty per cent., the amount provided for by the statute. Said latter war-

Moyers v. Memphis.

rant was accepted by complainants, with the express
reservation of their right to demand payment of the
full fifty per cent. of the claim, and without· waiving
their right to do so. The sum remaining unpaid on·
account of this fee originally agreed on between the
parties is $6,357.86. · The sole ground for refusing to
pay this amount now claimed by complainants was the
provision in said statute limiting the amount of the
fees of attorneys to twenty per cent. of·the claim.
It is stated in the agreement of the parties: ·

"That if said enactment limiting counsel fees ·to
twenty per centum of collection is valid, then com-
plainants are entitled to take nothing by this suit;
that if said enactment in its effect upon the rights of
complainants herein is unconstitutional, then com-
plainants are entitled to a decree in said sum of
$6,357.86."

The claim in question was referred to the court of
claims under the act of Congress of 1887 (Act March
3, 1887, chapter 359, 24 Stat. 505), commonly called
the "Tucker Act." It was further agreed by com-
plainants, at the time they were employed to prosecute
said claim, that they were to hold the city free from
any claim against it by the estate of Gilbert Moyers,
deceased, on account of any services rendered by him
during his lifetime.

It is not claimed by the city that complainants did
not perform the services which they undertook in a
proper and successful manner; and no effort is made
to defeat the claim now presented on the ground that

the fee contracted for was excessive, or unreasonable, or extortionate. No such question is raised by the city.

The only question, therefore, is whether the city can lawfully pay, and the complainants lawfully receive, the additional thirty per cent. of said claim, under section 4 of the appropriation act heretofore quoted.

Complainants alleged that said act, attempting to limit counsel fees in the matter of claims included therein, so far as said limitation would operate to deny to them the fee agreed on, by contract, and whereunder their services had been fully rendered prior to said act, in a proper manner before said court of claims, is unconstitutional and void, as being in contravention of the terms of the Fifth Amendment to the Constitution of the United States, in that its provisions attempt to deprive complainants of their liberty to enforce a valid contract under which the consideration had passed from them to the other contracting parties, and also in that its provisions attempt to deprive them of their property rights without due process of law.

The latter part of the Fifth Amendment of the Constitution of the United States provides that:

No person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation."

The Fourteenth Amendment to the Constitution provides:

"Nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

In *Adair* v. *United States,* 208 U. S., 161, 28 Sup. Ct., 277, 52 L. Ed., 436, 13 Ann. Cas., 764, the court, having under consideration the constitutionality of Act June 1, 1898, chapter 370, 30 Stat., 424, concerning carriers engaged in interstate commerce, and their employees, said:

"The first inquiry is whether the part of the tenth section of the act of 1898, upon which the first count of indictment was based, is repugnant to the Fifth Amendment of the Constitution, declaring that no person shall be deprived of liberty or property without due process of law. In our opinion that section, in the particular mentioned, is an invasion of the personal liberty, as well as of the right of property, guaranteed by that amendment. Such liberty and right embraces the right to make contracts for the purchase of the labor of others and equally the right to make contracts for the sale of one's own labor; each right, however, being subject to the fundamental condition that no contract, whatever its subject-matter, can be sustained which the law, upon reasonable grounds, forbids as inconsistent with the public interests or as hurtful to the public order or as detrimental to the common good."

It was further said, by the court in that case, quoting from Cooley on Torts, p. 278, that:

"It is a part of every man's civil rights that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result, of whim, caprice, prejudice, or malice. With his reasons neither the public nor third persons have any legal concern. It is also his right to have business relations with any one with whom he can make contracts, and if he is wrongfully deprived of this right by others he is entitled to redress."

The court cited *Lochner* v. *New York,* 198 U. S., 45, 25 Sup. Ct., 539, 49 L. Ed., 937, 3 Ann. Cas., 1133, which involved the validity of a state enactment prescribing maximum hours for labor in bakeries, and quoted from that opinion as follows:

"The general right to make a contract in relation to his business is part of the liberty of the individual protected by the Fourteenth Amendment of the Federal Constitution. . . . Under that provision no State can deprive any person of life, liberty, or property without due process of law. The right to purchase or to sell labor is part of the liberty protected by this amendment, unless there are circumstances which exclude the right."

The court further said, in the *Adair Case:*

"In every case that comes before this court, therefore, where legislation of this character is concerned, and where the protection of the federal Constitution is sought, the question necessarily arises: Is this a fair, reasonable, and appropriate exercise of the police

Moyers v. Memphis.

power of the State, or is it an unreasonable, unnecessary, and arbitrary interference with the right of the individual to his personal liberty or to enter into those contracts in relation to labor which may seem to him appropriate or necessary for the support of himself and his family? Of course the liberty of contract relating to labor includes both parties to it. The one has as much right to purchase as the other to sell labor.''

Without quoting all the pertinent language in this opinion, it is sufficient to say it cites quite a large number of cases for the position that the employer and employee have equality of right as to the making of contracts, and that any legislation that disturbs that equality is an arbitrary interference with the liberty of contract, which no government can legally justify in a free land.

In *Allgeyer v. Louisiana,* 165 U. S., 589, 17 Sup. Ct., 431, 41 L. Ed., 832, the supreme court, discussing the Fourteenth Amendment of the federal Constitution, said:

''The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties, to be free to use them in all lawful ways; to live and work where he will, to earn his livelihood by any lawful calling, to pursue any livelihood or avoca-

135 Tenn.—18

tion, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned.''

The court further said in that case:

''In the privilege of pursuing an ordinary calling or trade, and of acquiring, holding, and selling property, must be embraced the right to make all proper contracts in relation thereto, and although it may be conceded that this right to contract in relation to persons or property, or to do business within the jurisdiction of the State, may be regulated and sometimes prohibited, when the contracts or business conflict with the policy of the State as contained in its statutes, yet the power does not and cannot extend to prohibiting a citizen from making contracts of the nature involved in this case outside of the limits and jurisdiction of the State.''

In *Lochner* v. *New York,* 198 U. S., 47, 25 Sup. Ct., 539, 49 L. Ed., 937, 3 Ann. Cas., 1133, the supreme court of the United States held that the limitation of employment in bakeries to sixty hours a week and ten hours a day, attempted by chapter 415, Laws of 1897, of the State of New York, was an arbitrary interference with the freedom to contract which is guaranteed by the Fourteenth Amendment of the Constitution, and is not sustained as a valid exercise of the police power to protect the public health, safety, morals, or general welfare.

The court in that case said:

Moyers v. Memphis.

"We think the limit of the police power has been reached and passed in this case. There is, in our judgment, no reasonable foundation for holding this to be necessary or appropriate as a health law to safeguard the public health, or the health of the individuals who are following the trade of a baker. If this statute be valid, and if, therefore, a proper case is made out in which to deny the right of an individual, *sui juris,* as employer or employee, to make contracts for the labor of the latter under the protection of the provisions of the federal Constitution, there would seem to be no length to which legislation of this nature might not go."

In *Williams* v. *Fears,* 179 U. S. 270, 21 Sup. Ct., 128, 45 L. Ed., 186, the supreme court of the United States said:

"And so as to the right to contract. The liberty, of which the deprivation without due process of law is forbidden, 'means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties, to be free to use them in all lawful ways, to live and work where he will, to earn his livelihood by any lawful calling, to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned.' "

In *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S., 211, 20 Sup. Ct., 96, 44 L. Ed., 136, the court discusses the question of whether private contracts may be avoided on account of legislation under the interstate commerce clause of the Constitution. The court said:

"There is no intimation in this remark that Congress has no power to legislate regarding those contracts which do directly regulate and restrain interstate commerce. The inference is quite the reverse, and it is plain that the case assumes, if private contracts, when entered into, do directly interfere with and regulate interstate commerce, Congress had power to condemn them. If the necessary, direct, and immediate effect of the contract be to violate an act of Congress, and also to restrain and regulate interstate commerce, it is manifestly immaterial whether the design to so regulate was or was not in existence when the contract was entered into. . . .

"Where the contract affects interstate commerce only incidentally, and not directly, the fact that it was not designed or intended to affect such commerce is simply an additional reason for holding the contract valid and not touched by the act of Congress. Otherwise the design prompting the execution of a contract pertaining to and directly affecting, and more or less regulating, interstate commerce, is of no importance. We conclude that the plain language of the grant to Congress of power to regulate commerce among the several States includes power to legislate

upon the subject of those contracts in respect to inter-
state or foreign commerce which directly affect and
regulate that commerce, and we can find no reasonable
ground for asserting that the constitutional provision
as to the liberty of the individual limits the extent of
that power as claimed by the appellants.''

In *Baltimore & Ohio Southwestern Ry. Co.* v. *Voigt,*
176 U. S., 498, 20 Sup. Ct., 385, 44 L. Ed., 560, the
supreme court, again discussing the question of the
power of Congress to control certain contracts, said:

''The principles declared in those cases (cases
cited) are salutary, and we have no disposition to
depart from them. At the same time it must not be
forgotten that the right of private contract is no small
part of the liberty of the citizen, and that the usual
and most important function of courts of justice is
rather to maintain and enforce contracts than to en-
able parties thereto to escape from their obligation on
the pretext of public policy, unless it clearly appear
that they contravene public right or the pubilc welfare.
It was well said by Sir George Jessel, M. R., in *Print-
ing & Registering Co.* v. *Sampson,* L. R., 19 Eq., 465;
'It must not be forgotten that you are not to extend
arbitrarily those rules which say that a given contract
is void as being against public policy, because, if
there is one thing which more than another public
policy requires, it is that men of full age and com-
petent understanding shall have the utmost liberty
of contracting, and that their contracts, when entered
into freely and voluntarily, shall be held sacred, and

shall be enforced by courts of justice.   Therefore you have this paramount public policy to consider—that you are not lightly to interfere with this freedom of contract.' ''

In the case of *McGowan* v. *Parish,* 237 U. S., 285, 35 Sup. Ct., 543, 59 L. Ed., 955, the supreme court recognized and enforced an attorney's fee contract, based upon a contingent amount depending on the amount collected, for services in prosecuting a claim against the government.   While there was no direct discussion of the point, the contract for a contingent fee was recognized as valid, and was enforced.   The amount contracted for in that case by the attorney was fifteen per cent. of the recovery, upon a claim of about $181,000.

In *Ball* v. *Halsell,* 161 U. S., 72, 16 Sup. Ct., 554, 40 L. Ed., 622, a contract for the payment of fifty per cent. of claims to be prosecuted against the government on account of Indian depredations was held illegal, in view of the facts of that case, and in view of the statute of March 3, 1891 (26 Stat., 851, chapter 538), applying to that class of claims.   This statute provided for the adjudication and payment of claims arising from Indian depredations, and it was provided by section 9 that:

"All sales, transfers or assignments of any such claims, heretofore or hereafter made, except such as have occurred in the due administration of decedents' estates, and all contracts heretofore made for fees and allowances to claimant's attorneys, are hereby declared void; and all warrants issued by the secretary

of the treasury, in payment of such judgments, shall
be made payable and delivered only to the claimant
or his lawful heirs, executors or administrators, or
transferee under administrative proceedings, except so
much thereof as shall be allowed the claimant's at-
torneys by the court for prosecuting said claim, which
may be paid direct to such attorneys; and the allow-
ances to the claimant's attorneys shall be regulated
and fixed by the court at the time of rendering judg-
ment in each case, and entered of record as part of
the findings thereof; but in no case shall the allowance
exceed fifteen per cent. of the judgment recovered
except in case of claims of less  .  .  .  than $500,
or where unusual services have been rendered or ex-
penses incurred by the claimant's attorney, in which
case not to exceed twenty per cent. of such judgment
shall be allowed by the court.''

This statute was upheld in the case referred to.
The court said:

''This act was passed before the attorney had either
recovered or received any money upon the principal's
claim against the United States.   The act did not
recognize either the lawfulness or the amount of the
claim, or make any appropriation for its payment.
But it provided for its ascertainment and adjudication
by judicial proceedings, and for the allowance, by the
judgment in those proceedings, of a reasonable com-
pensation to the attorney.   The restriction of the com-
pensation of attorneys to the amounts so allowed by

the court was one of the terms and conditions upon which the United States consented to be sued.''

But the court, in that case, further said:

''By several decisions of this court, indeed, beginning at December term, 1853, contracts for contingent fees, by which attorneys, employed to prosecute claims against the United States, were to be allowed a proportion of the amount recovered in case of success, and nothing in case of failure, were held to be lawful and valid. *Wylie* v. *Coxe* (1853), 15 How. (56 U. S.), 415, 14 L. Ed., 753; *Wright* v. *Tebbitts* (1875), 91 U. S., 252, 23 L. Ed., 320; *Stanton* v. *Embry* (1876), 93 U. S., 548, 23 L. Ed., 983; *Taylor* v. *Bemiss* (1883), 110 U. S., 42, 3 Sup. Ct., 441, 28 L. Ed., 64. The reason for upholding the validity of such contracts was first stated by Mr. Justice Miller, in *Taylor* v. *Bemiss,* as follows:    'The well-known difficulties and delays in obtaining payment of just claims, which are not within the ordinary course of procedure of the auditing officers of the government, justifies a liberal compensation in successful cases, where none is to be received in case of failure.    Any other rule would work much hardship in cases of creditors of small means, residing far from the seat of government, who can give neither money nor personal attention to securing their rights.' 110 U. S., 45, 3 Sup. Ct., 443, 28 L. Ed., 65. The proportion allowed to the attorneys, in *Wylie* v. *Coxe,* was one-twentieth; in *Wright* v. *Tebbitts,* one-tenth; in *Stanton* v. *Embry,* one-fifth; and in *Taylor* v. *Be-*

*miss,* one-half.'' *Ball* v. *Halsell,* 161 U. S., 72, 80, 16 Sup. Ct., 554, 556, 40 L. Ed., 623, 624.

In a note to *McMicken* v. *Perin,* 18 How., 507, 15 L. Ed., 504, it is said:

''An agreement to give plaintiff's attorney part of the recovery is valid.''

Also:

''An agreement by an attorney to conduct a suit and give the plaintiff a fixed share of the proceeds after paying expenses has been sustained.''

Also:

''An agreement between attorney and client, fairly made, for contingent fees, will be sustained both in law and equity.''·

Also:

''There is nothing illegal, immoral, or against public policy in an agreement by an attorney at law to present and prosecute a claim, either at a fixed compensation or for a reasonable percentage upon the amount recovered, *Wright* v. *Tebbitts,* 1· Otto (91· U. S.), 252, 23 L. Ed., 320; or for a contingent compensation, *Stanton* v. *Embry,* 3 Otto (93 U. S.), 548, 23 L. Ed., 983; or to carry on the suit at their own costs and charges, and have one-half of the amount recovered, *Mayton* v. *Raymond,* 4 Am. L. Times (N. S.), 21. See *McPherson* v. *Cox,* 6 Otto (96 U. S.), 404, 24 L. Ed., 746.''

It is provided by the United States statute that:

''Nothing herein shall be construed to prohibit attorneys, solicitors, and proctors from charging to

and receiving from their clients other than the government, such reasonable compensation for their services, in addition to the taxable costs, as may be in accordance with general usage in their respective States, or may be agreed upon between the parties.'' Rev. St. U. S. sec. 823 (Act Feb. 26, 1853, chapter ·80, 10 Stat. 161 [U. S. Comp. St. 1913, sec. 1375.])

In *Nutt* v. *Knut*, 200 U. S., 12, 26 Sup. Ct., 216, 50 L. Ed., 348, the direct question of the validity of a fee contract providing for thirty-three and one-third per cent. of the amount recovered, for prosecuting a war claim against the government, was involved. The contract in that case also stipulated that the fee should be a lien upon the claim, and upon any draft, money, or evidence of indebtedness issued thereon. The defense was based in part upon section 3477 of the Revised Statutes (U. S. Comp. St. 1913, sec. 6383), which declares null and void certain transfers and assignments of claims against the United States. The supreme court held that part of the contract undertaking to fix a lien on the claim was in contravention of said section of the Revised Statutes, and therefore void; but it further held that this provision of the contract did not vitiate the entire contract, and that the contract stipulating for the payment of a fee of thirty-three and one-third per cent. of the claim allowed was valid. The court said:

''Such an agreement did not give the attorney any interest of share in the claim itself, nor any interest in the particular money paid over to the claimant

by the government.  It only established an agreed
basis for any settlement that might be made, after the
allowance and payment of the claim, as to the at-
torney's compensation.  It simply created a legal
obligation upon the part of the estate, which, if not
recognized after the collection of the money, could
have been enforced by suit for the benefit of the at-
torney, without doing violence to the statute or to
the public policy established by its provisions.''

In *Re Paschal,* 10 Wall., 483, 19 L. Ed., 992, the
supreme court, speaking as to the rights of counsel
to collect fees, said:

''The lawyer in charge of a case acts both as
solicitor and counsel.  His services in the one capacity
and the other cannot be well distinguished.  And, as
a general rule, counsel fees, as well as those of at-
torney or solicitor, constitute a legal demand for
which an action will lie.  And whilst, as between party
and party in a cause the statutory fee bill fixes the
amount of costs to be recovered, as between attorney
or solicitor and client a different rule obtains.  The
claim of the attorney or solicitor in the latter case,
even in England, extends to all proper disbursements
made in the litigation, and to the customary and usual
fees for the services rendered.

''The fee bill adopted by Congress in 1853 recog-
nizes this general rule, and in fact adopts it.  By
the first section of that act, it is expressly declared
that nothing therein shall be construed to prohibit
attorneys, solicitors, and proctors from charging to

and receiving from their clients, other than the government, such reasonable compensation for their services, in addition to the taxable costs, as may be in accordance with general usage in their respective States, or may be agreed upon between the parties.''

In *Stanton* v. *Embry*, 93 U. S., 548, 23 L. Ed., 983, suit was brought to recover for services rendered by an attorney in prosecuting a claim against the United States, before the treasury department. Defendants objected that the contract relied on in the declaration was one for contingent compensation. The supreme court said:

''Such a defense, in some jurisdictions, would be a good one; but the settled rule of law in this court is the other way. Reported cases to that effect show that the proposition is one beyond legitimate controversy. *Wylie* v. *Coxe*, 15 How., 415, 14 L. Ed., 753; *Wright* v. *Tebbitts*, 91 U. S., 252, 23 L. Ed., 320.

''Professional services were rendered by an attorney, in the first case cited, in prosecuting a claim against the Republic of Mexico, under a contract that the attorney was to receive five per cent. of the amount recovered.''

The court goes on to show that, in both the cases referred to, the contracts for contingent fees were upheld. In that case the supreme court sustained the propositions that professional services are as legitimate as services rendered in court, where they are rendered in preparing and advocating a just claim, that in such matters parties required the aid of

advocates, and that the legal profession have a right to accept such employment and receive compensation for their services, and that the courts cannot adjudge such contracts illegal, if free from fraud, misrepresentation, and unfairness. 93 U. S., 548-558, 23 L. Ed., 983.

In *Moyers et al.* v. *Fahey*, 43 Wash. L. Rep., 691, the supreme court of District of Columbia, in a well-considered opinion, held that section 4 of the act now in question was unconstitutional, as violative of the Fifth Amendment of the Constitution, as applied to the facts of that case, which were practically the same as in the present case.

In *Matthews* v. *People*, 202 Ill., 389, 67 N. E., 28, 63 L. R. A., 73, 95 Am. St. Rep., 241, it was said:

"It is now well settled that the privilege of contracting is both a liberty and a property right. Liberty includes the right to make and enforce contracts, because the right to make and enforce contracts is included in the right to acquire property. Labor is property. To deprive the laborer and the employer of this right to contract with one another is to violate section 2 of article 2 of the Constitution of Illinois, which provides that 'no person shall be deprived of life, liberty or property without due process of law.' It is equally a violation of the Fifth and Fourteenth Amendments to the Constitution of the United States, which provides that no person shall be deprived of life, liberty or property without due process of law."

But defendant's solictor, in his able brief, cites and relies on numerous cases, where the supreme court has held that the liberty of contract and right of property are subject to certain regulations and control. *Frisbie* v. *U. S.*, 157 U. S., 160, 15 Sup. Ct., 586, 39 L. Ed., 657, was a case sustaining the right to regulate and control fees in pension cases, and announcing that no pensioner has a vested, legal right in his pension, and that pensions are bounties, which Congress may give or withhold at its discretion. *Fitzgerald* v. *Grand Trunk Railroad*, 63 Vt., 169, 22 Atl., 76, 13 L. R. A., 70, was an action to recover a rebate on a shipping contract made before the Interstate Commerce Act was passed. But it was held that such contracts were made subject to the right of Congress to legislate on that subject and to control interstate commerce, in the interest of the public. The Legal Tender cases of *Knox* v. *Lee* and *Parker* v. *Davis*, 79 U. S. (12 Wall.), 457, 20 L. Ed., 287, are relied on by defendant; but these cases were based on the power of Congress to regulate the coinage of money and the value thereof, and we think they are not in point here. So the case of *L. & N. R. R. Co.* v. *Mottley*, 219 U. S., 467, 31 Sup. Ct., 265, 55 L. Ed., 297, 34 L. R. A. (N. S.), 671, is not controlling, as it was based on the power of Congress to regulate interstate commerce between the States, under that clause of the Constitution.

*Wailes* v. *Smith, Comptroller*, 157 U. S. 271, 15 Sup. Ct., 624, 39 L. Ed., 698, is also cited and relied

on by defendant.  It appears that in 1878 the legis-
lature of Maryland authorized Mr. Wailes to prose-
cute, on behalf of the State, all of the "claims of the
State against the government of the United States,
and he is hereby allowed a commission of thirty per
cent. upon any sum that shall be recovered by him and
paid by the government of the United States into
the treasury of the State of Maryland, as full com-
pensation for his services and expenses in the prose-
cution of said claims of said State against the United
States," etc.   The third section of the act directed
the comptroller of the treasury to issue his warrant
to pay said Wailes a commission of thirty per cent. on
such sum as shall be recovered by him and paid by
the government into the treasury.  Laws of Maryland
1878, chapter 224.

In 1891, the amounts which had been collected from
the several States and territories under the Direct
Tax Act of 1861 (Act Aug. 5, 1861, chapter 45, 12
Stat. 292) were refunded.  The act of Congress (Act
March 2, 1891, chapter 496, 26 Stat. 822) authorizing
the same contained the proviso:

"That no part of the money hereby appropriated
shall be paid out by the governor of any State or
territory or any other person to any attorney or
agent under any contract for services now existing
or heretofore made between the representative of any
State or territory and an attorney or agent."

The act further provides that no money should be
paid to any State under this act—"until the legis-

lature thereof shall have accepted, by resolution, the sum herein appropriated, and the trusts imposed, in full satisfaction of all claims against the United States on account of the levy and collection of said tax, and shall have authorized the governor, to receive said money for the use and purposes aforesaid.''

The general assembly of Maryland accepted these terms and provisions, and received from the federal government $371,299, and directed that it be applied in payment of the State debt and to the sinking fund. The plaintiff, Wailes, began proceedings by petition for mandamus against the State comptroller, to compel him to draw a warrant on the treasurer in his favor for thirty per cent. of the money which had been so paid into the State treasury by the federal government. The petition was dismissed, and affirmed by the supreme court of Maryland; and thereupon a writ of error was sued out, and the case carried to the supreme court of the United States. It was held that the motion to dismiss must prevail; that the judgment of the court of appeals of Maryland, that there was no ministerial duty resting on the comptroller to draw his warrant in favor of the plaintiff in error, because no appropriation had been made by the general assembly for the payment of his claim, was clearly decisive of the controversy. The court did also say that this money passed to the State with the express obligation not to make this deduction, and the State's acceptance of it bound her to the condition imposed, and that she could not accept the gift,

and at the same time repudiate the condition. The court further said:

"As the State, when she took the money, was bound by the condition upon which the payment was made, so the plaintiff in error, if he made the collection, is equally bound thereby."

We think the actual decision of that case was predicated upon other grounds, and that the language of the court quoted was perhaps only a dictum of the court; still, in view of the express provision of the act of Congress, under which the payment was made, the case is not conclusive as an authority in the present case. The express conditions under which the payment was made, as set out in the act of Congress, and the acceptance of these conditions by the State of Maryland, were controlling on the point in question.

Other authorities have been cited in defendant's brief. We think, however, that they are to be distinguished from the instant case, and are not controlling.

We note, however, that the supreme court of Arkansas, in *Ralston* v. *Dunaway*, 184 S. W., 425 (Advance Sheets, May 3, 1916), has passed upon the question, and held that section 4 of the appropriation act of 1915, now in question, was constitutional and binding upon the parties in that case. After reviewing that case, we are not convinced of its soundness.

We do not doubt that Congress has power to determine the conditions upon which the government

135 Tenn.—19

will consent to be sued, or the conditions upon which it will grant pensions or other bounties, or that it may prescribe the conditions upon which attorneys will be allowed to represent claimants or litigants before any of the courts of the government, within certain reasonable limitations, and where this is done by general laws, applicable to all alike, and in advance of the services rendered in such courts. We think Congress may control the terms upon which attorneys may appear in the courts or before the departments of the government, to represent its wards, such as the Indian tribes, or its pensioners.

We do not doubt that Congress has the power to regulate and restrain the conduct and contracts of all persons for the common good. The possession and enjoyment of ''liberty'' and ''property'' are, of course, subject to such reasonable conditions as may be essential to the safety, health, peace, good order, and morals of the community. The freedom to use one's faculties or earn one's living in all lawful ways extends only to the point where private right becomes secondary to the public good, and the inquiry still remains whether the particular calling in which the citizen proposes to engage, or the particular contract or right which he proposes to assert, is consistent with such rules of action as have been rightfully prescribed by the State or government. See 5 Enc. U. S. Supreme Court Reports, 555, and cases cited.

''The liberty of contract is one of the inalienable rights of a citizen. The rigth to pursue a lawful

calling embraces the right to enter into all contracts proper, necessary, and essential to the carrying out of the purpose of such calling, and the possession of property, of which a person cannot be deprived, implies the right to acquire and dispose of property; and as property can only be acquired and disposed of, as between living persons, by contract, a general prohibition against entering into contracts with respect of property, or having as their object the acquisition of property, would be held to be unconstitutional and void." ˙ 5 Enc. Dig. U. S., 554, and cases cited.

The due process clauses of the federal Constitution, while designed to preserve life, liberty, and property inviolate, as against the encroachments of mere arbitrary power, were not intended to interfere with the power of the State, sometimes termed the police power, to prescribe regulations for the protection and promotion of the health, peace, morals, education, good order, and general welfare of the people. Both property and liberty are held on such reasonable conditions as may be imposed by the governing power of the State in the exercise of those powers, and with such conditions neither the Fifth nor Fourteenth Amendment was designed to interfere. The liberty of contract and the right of property are not absolute and universal. It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts. These rights, like all others,

must be exercised in subordination to law. The liberty of contract cannot be exercised contrary to established public policy, and the public policy of the State must be deemed to be authoritatively declared by its own courts, and as so declared it cannot be contravened by the contracts of parties. The State has the undoubted right to impose restraints demanded by the public interest, or by the safety and welfare of the State. 5 Enc. Dig. U. S., 557, 558, and cases cited.

Applying the principles of these authorities to the agreed facts in the present case, we think it results that the contract between the parties, although for a contingent fee, was a legal and valid contract, not against any established public policy, or contrary to any law or statute of the government, and that complainants, having already performed the contract on their part and become entitled to the compensation agreed on upon the payment of the claim by the government, had a vested property right in the same, which could not be destroyed by an arbitrary act of Congress, and therefore that section 4 of said act of March 4, 1915, in so far as it undertakes to deprive complainants of the benefits of their contract, is void under the Fifth Amendment of the Constitution.

It must be remembered that the services of complainants had already been performed, and that their interest and rights under the contract had already become vested, subject to be defeated, it is true, by

the failure of Congress to make the necessary appropriation to pay the claim in question. It should be noted, also, that this act (section 4) is not a general law of the land, but applies only to the particular claims therein provided for.

It will be noted, also, that no question is made, in this case, by the defendant, as to the reasonableness or validity of the contract; but the refusal to pay the full amount contracted for is based alone upon section 4 of the appropriation act. While the courts do not always favor contingent fees, and are inclined to look with some suspicion upon such contracts especially where the amount agreed to be paid is so large a proportion of the claim as in the present case, still the decided trend of judicial decision and of legislation has been in favor of upholding and enforcing such contracts, where no question of fraud, or misrepresentation, or unfair dealing is set up against them by the opposite party.

We do not agree with learned counsel for defendant that the claim appropriated for and paid to the city, in this case, was a bounty or a gift; it was in the nature of a debt, and was supported by a good and valuable consideration. It is true that its payment could not be enforced by legal process, and was dependent upon the voluntary action of Congress. But the findings of the court of claims, which is attached to the agreement of facts as Exhibit 3, shows that the claim was based upon "the reasonable rental value of the premises" in question from January 1,

1863, to April 1, 1866, which were taken and occupied by the military authorities of the federal government during the Civil War.

It follows, therefore, that complainants, notwithstanding section 4 of the act of Congress of March 4, 1915, are entitled, as against the city of Memphis, to recover the balance of their compensation as agreed on; and the decree of the chancellor will be affirmed, but provided that no interest will be allowed on the claim, and that the costs of the case, in both courts, will be paid by complainants.

Judge W. H. SWIGGART, SR., of Union City, sat as Special Justice during the April term, 1916, for West Tennessee, in lieu of Chief Justice NEIL, who was presiding over the State senate, sitting as a court of impeachment, at Nashville, during the whole of that term.